HORACE J. MARTIN *vs.* HARRY K. STONE & others.

Suffolk.    January 5, 1955. — April 27, 1955.

Present: QUA, C.J., WILKINS, SPALDING, & COUNIHAN, JJ.

*Contract*, What constitutes, As to holding corporate stock.    *Partnership*, What constitutes.

The record in a suit in equity did not show error in a determination by the trial judge that the plaintiff had failed to sustain the burden of proving an allegation in the bill that, upon the formation of a voting trust of stock of a corporation by the plaintiff, the defendant and a third stockholder and the placing in the trust of virtually the same

number of shares by each, it was agreed by them that "no matter what might happen in the future to anyone involved, the relative stock holdings of . . . [the three] should remain equal and nothing would be done . . . to change their ratio of holdings." [542, 546]

A partnership relation between two men was not established by the mere facts that they frequently referred to themselves as partners, and that they were principal and equal stockholders in a business corporation and, with a third principal stockholder, established a voting trust of their stock under an instrument appointing the three the trustees, giving them, or a majority of them, "all right to vote upon said stock" and the power to "exercise all the rights of shareholders," and obliging them to "exercise their best judgment in the interests of the corporation." [546–547]

BILL IN EQUITY, filed in the Superior Court on July 6, 1953. The suit was heard by *Good, J.*

*Joseph G. Bryer,* (*Thomas H. Mahony* with him,) for the plaintiff.

*Henry M. Leen,* (*Thomas E. Goode & Joseph M. Hargedon* with him,) for the defendant Harry K. Stone.

*Robert W. Meserve & E. Curtiss Mower,* for the defendant Publishers Book Bindery, Inc., submitted a brief.

*Alford P. Rudnick & Joshua A. Guberman,* for the defendant The Stone Charitable Foundation, Inc., submitted a brief.

WILKINS, J. By this bill in equity the plaintiff seeks to charge the defendant Stone (hereinafter called the defendant) and the defendant The Stone Charitable Foundation, Inc. (hereinafter called the Foundation), as trustee for the plaintiff of one half of a certain number of shares of capital stock of the defendant Publishers Book Bindery, Inc. (hereinafter called the Bindery). The shares had been purchased by the Foundation through the defendant from one Frederick C. Clark, and his wife, Edith L. Clark, both having deceased before this suit was brought. The defendant University Press of Cambridge, Inc. (hereinafter called the Press), was concerned in allegations of the bill and in a prayer relating to certain shares of its capital stock likewise purchased by the Foundation from the Clarks, but this question has been waived. From a final decree dismissing the bill the plaintiff appealed.

The bill alleges in paragraphs 6[1] and 7[2] an agreement with the defendant, as to which the judge, in a brief statement of findings, found the plaintiff had not sustained the burden of proof. Later at the plaintiff's request, the judge made a report of the material facts found by him. G. L. (Ter. Ed.) c. 214, § 23, as appearing in St. 1947, c. 365, § 2. From that report our summary of facts is taken. The evidence is reported.

The Bindery was organized in 1938 with 2,000 shares of common stock, of which 1,500 shares owned equally by Clark and the plaintiff were placed in a voting trust for ten years. The Press was an affiliate of the Bindery. The plaintiff, Clark, and the defendant were stockholders in the Press. The defendant wished to become a stockholder in the Bindery. The plaintiff, the defendant, and the Clarks discussed depositing stock in a fund exempt from taxation out of which contributions could be made toward the establishment of a graphic arts school at Boston University. After many conversations the Clarks and the plaintiff agreed to terminate the voting trust and to redistribute the Bindery common stock. The plaintiff sold Clark 243 shares, which were turned over to the defendant, and Clark transferred 312 shares of his own to the defendant. Thereafter the respective shareholdings were: the plaintiff 555, the defendant 555, and Clark 556.[3] On February 13, 1947, the voting trust was terminated, and a new voting trust, called the Clark-Martin-Stone voting trust, was created for a term of twenty years, into which these shares were placed. The remaining common stock was held largely by preferred stockholders who had received it as a bonus when buying pre-

[1] "The said transfer of stock to said Stone and the placing of said stock in said voting trust was done by the plaintiff upon the distinct understanding and agreement between said Stone and said Frederick C. Clark on one hand, and the plaintiff on the other, that no matter what might happen in the future to anyone involved, the relative stock holdings of the plaintiff, said Stone and said Clarks should remain equal and nothing would be done by either to change their ratio of holdings in the common stock of said Bindery."

[2] "It was further agreed by the defendant, Stone, Clark and the plaintiff that the plaintiff should suffer no financial loss in his then position in the Bindery and Press, and that he should always retain his position with the Bindery and Press as long as he choose with no reduction in his compensation."

[3] The Clark shares in the Bindery were held jointly by the Clarks, as appears from the new voting trust agreement.

ferred stock.   In the court below the plaintiff contended
that the stock transfers and the deposit of the stock in the
voting trust were made upon an agreement that, no matter
what might happen, the common stock ownership in the
Bindery of the plaintiff, the defendant, and Clark should
remain equal, and that the plaintiff "should suffer no finan-
cial loss in his then position and should always retain his
position as long as he chose to do so."

On December 9, 1948, the Clarks gave the Foundation
an option to buy their Bindery stock.   At that time the
defendant told no one about it.   His failure to disclose this
fact "is altogether inconsistent with his repeated pronounce-
ments of his understanding of a 'partnership arrangement'"
in his letter dated March 17, 1949, to the plaintiff, and with
his letter of May 23, 1950, to Clark in which he urges ter-
mination of the voting trust.   The latter letter in the light
of the option "is filled with double talk," and "puts a blot
upon the expressions contained in the letter of April 20,
1951," to the plaintiff.   "If the spirit of that letter were
followed by Stone, he never would have kept the option a
secret."   The letter of May 23, 1950, was written upon the
plaintiff's report to the defendant that Clark was in poor
health, and when the plaintiff suggested the voting trust
should be terminated, "it may well have been the oppor-
tunity for Stone to act to accomplish that [termination]
for which he had hoped and waited."   At this time the
plaintiff suggested that the defendant and he purchase
Clark's stock, pointing out the 1947 arrangement in which
"we all were to be equal shareholders."   In the letter last
referred to the defendant states, "I therefore am voting
wholeheartedly with Horace to go back to the situation'
prior to February of 1947,"[1] and in that letter "it is made
to appear" that the plaintiff was willing to turn his stock
over to the Foundation.   "This was not the fact.[2]   From

---

[1] The full sentence in the letter was: "I have never had a man go along with
me on a contract that was not agreeable to him, and I therefore am voting whole-
heartedly with Horace to go back to the situation prior to February of 1947."

[2] The plaintiff testified that he was present and heard the defendant dictate
to his secretary the letter of May 23, 1950, which was substantially along
the lines they had talked.

the tone of the communications to which reference is made, no one would believe that the option existed, and if it had been revealed to Martin, and by him called to the attention of the Clarks, much light . . . [might] have been shed by Mr. and Mrs. Clark if and when the option were exercised . . . especially in its relation to continuing in the voting trust or ever becoming the stock of the . . . Foundation unless Martin made the same disposition of his stock."

On May 23, 1950, the Clark-Martin-Stone voting trust was terminated. On June 9, 1950, the defendant notified the secretary of the Bindery that the Clark and Stone stock was to be transferred to the Foundation, and so notified the plaintiff, who on July 6, 1950, as president signed the new certificates of stock issued in the name of the Foundation. On June 15, 1950, the plaintiff wrote the defendant that now the Clarks have sold their stock he "would like very much to be on an equal basis with you (or your Stone trust) as we have been for so many years." On June 19, 1950, the plaintiff wrote the defendant suggesting an exchange of Press stock for Bindery stock, any difference in value to be settled in cash. On June 20, 1950, the plaintiff wrote the defendant that he "would like to acquire one half of his [Clark's] common shares which will put me back where I was in 1947 and make us equal partners." On April 16, 1951, and on April 26, 1951, the plaintiff wrote the defendant urging him to turn over to the plaintiff one half of the Clark stock, for which the plaintiff expected to reimburse the defendant. In reply the defendant said that he would be willing or would like to purchase the plaintiff's stock. The plaintiff was not interested.

On October 16, 1952, the directors of the Bindery voted to retire the plaintiff as president upon pension, and then rescinded that vote when the plaintiff read a letter from attorneys he had consulted which was addressed to the president, directors, and stockholders.

From the plaintiff's acts as an officer of the company and from his correspondence little, if any, support can be found for the existence of the agreement alleged in the bill. He

made no protest when his salary was reduced in 1950. The votes of the directors are recited as being unanimous. He was a director and as president presided at their meetings. At the annual stockholders' meetings he joined in unanimous votes ratifying all acts of the directors. He made no complaint when he was dropped as treasurer. In 1949 he acquired stock from his mother, and offered none of it to Clark or the defendant. In none of his letters to the defendant did the plaintiff ever assert a right to one half of the Clark stock, although he expressed a desire to acquire it by purchase or exchange. The plaintiff explains his conduct by saying, "my reason for not being perhaps more legalistic or specific was because I felt very strongly that if I attempted to do so I wouldn't last very long in that company; and so I tried to be persuasive in the letters and convince him (Stone) it was the right thing to do."

The defendant frequently described his association with Clark and the plaintiff as a partnership. From the time of the new voting trust until August 25, 1952, the plaintiff and the defendant called themselves partners. On that date the defendant wrote a letter in reply to letters of the plaintiff dated July 2, 1952, and July 20, 1952, in which the plaintiff asserted his right to the stock for the first time. In that letter the defendant stated that stockholders and directors run a corporation, and that any agreement that plaintiff "would never be any worse off . . . is silly."

"If any such agreement as alleged in the bill of complaint was made, it is difficult to understand Martin's official acts and his tardiness in asserting his right to one half of the Clarks' stock; on the other hand, it is difficult to understand Martin's willingness to terminate the old voting trust and enter the new one unless such an agreement were made; it is clear that Martin hoped or wished he would not be worse off after the new voting trust was established than he had been before. The burden of proving that this led to the agreement set out in the bill of complaint has not been sustained by a fair preponderance of the testimony."

The plaintiff argues that the judge erred in ruling that the plaintiff had not sustained the burden of proof. We think that in so doing the judge made a finding and not a ruling. Whichever it was, however, there was no error. As a finding it is not plainly wrong. The other findings, none of which, as the plaintiff correctly contends, can be said to be plainly wrong, do not, as matter of law, require a conclusion that the agreement was made. Neither could it be ruled on the evidence that the plaintiff had sustained the burden resting upon him.

We find it unnecessary to pass upon contentions of the defendants that the plaintiff is barred by the terms of a release executed on February 13, 1947, or that the parol evidence rule precludes consideration of some of the evidence on which certain findings were based.

The plaintiff's main reliance is that the plaintiff and the defendant were partners, and that the defendant's conduct in secretly obtaining for the Foundation the option from the Clarks and in later causing the option to be exercised was a breach of a fiduciary obligation. The principle of law is sound. *Mendelsohn* v. *Leather Manuf. Corp.* 326 Mass. 226. The difficulty is in fitting it to the facts. The chief basis for the contention that there was a partnership seems to be that the parties frequently referred to themselves as such. We are not clear as to the precise terms of the alleged partnership. The relationship, whatever it was, took form within the framework of two existing corporations, which continued to be legal entities distinct from their stockholders. That the plaintiff, the defendant, and Clark were the principal stockholders did not make them partners or either corporation a partnership. *Leventhal* v. *Atlantic Finance Corp.* 316 Mass. 194, 198. It is not enough that the parties referred to each other as partners. *Cardullo* v. *Landau*, 329 Mass. 5, 9.

In his reply brief the plaintiff states that the defendant testified that the partnership he had in mind in his reference to his relationship with the plaintiff was his business arrangement as to the 1,500 shares of common stock in the Bindery. This arrangement was the Clark-Martin-Stone

voting trust. The parties to the voting trust were the Clarks, the plaintiff, and the defendant, and in the trust instrument the three men were appointed voting trustees, and to them as joint tenants were transferred shares of common stock as follows: Bindery — Clarks jointly, 556; Martin, 555; Stone, 555. Press — Clark, Martin, and Stone, 20 shares each. The trust instrument gave them, or a majority of them, "all right to vote upon said stock." They were empowered to "exercise all the rights of shareholders," and were placed "under obligation to exercise their best judgment in the interests of the corporation." The trust instrument recited no power of the beneficial owners to control the affairs of either corporation. See *First National Bank* v. *Chartier*, 305 Mass. 316, 320; *State Street Trust Co.* v. *Hall*, 311 Mass. 299, 301. Also lacking was any provision, such as that found in *Arnold* v. *Maxwell*, 223 Mass. 47, 49, that the parties to the agreement would share equally "as to ownership, profits and expenses." The alleged partnership does not meet the definition of the uniform partnership act, G. L. (Ter. Ed.) c. 108A, § 6: "an association of two or more persons to carry on as co-owners a business for profit."

The plaintiff argues that the trial judge looked upon the relationship as a partnership. He, of course, made no such finding, although he did find that the parties called themselves partners from the date of the voting trust, which was February 13, 1947, until August 25, 1952. But if he had reached the conclusion that there was a partnership, it would seem not only that he would have made that express finding, but he would not have dismissed the bill.

The plaintiff, while stressing the partnership feature, has in several places in his brief used in the alternative "joint venture" or "co-adventurer." Treating his contention on that footing, we would be constrained to reach the same result.

*Decree affirmed.*